IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LISA G. FINCH AND ALI ABDELHADI,
               Plaintiffs,

      vs.                                              No. 19-1310-EFM

DUSTIN L. MEIER, *et al.*,
               Defendants.


MEMORANDUM AND ORDER


Plaintiffs Lisa Finch and Ali Abdelhadi bring this action under 42 U.S.C. § 1983 alleging unlawful detention by four officers of the Wichita Police Department. The detention occurred shortly after the tragic death of Finch's son Andrew, which is itself the subject of separate lawsuit, *Finch v. City of Wichita, Kansas*, No. 18-1018-JWB, 2020 WL 3403121, at *5 (D. Kan. June 19, 2020).[1] In that lawsuit, Finch and her daughter Dominica allege police officers used excessive force in the fatal shooting of Andrew Finch. The present action does not turn on the reasonableness of the shooting, but on the lawfulness of the approximately hour-long detention of Abdelhadi and Finch. Defendant WPD officers Dustin Meier, Codie Trobaugh, Benjamin Jonker, and Chad

---

[1] Officer Justin Rapp, who fired the fatal shot, has stated he believed Andrew Finch was drawing a weapon. On June 19, 2020, the court denied Rapp's motion to summary judgment. At that same time, the court granted summary judgment in favor of the City of Wichita on plaintiff's municipal liability claim against the City of Wichita, and in favor of Sergeant Benjamin Jonker. Because there was "no evidence that Jonker actively participated in Rapp's use of force or that he bypassed an opportunity to intervene," the court found that Jonker was protected by qualified immunity. 2020 WL 3403121, at 16. Rapp and the plaintiffs have appealed these rulings.

Beard, who were not directly involved in the shooting, have moved for summary judgment on grounds of qualified immunity. In light of all the circumstances faced by Defendants at the time of the incident, the court finds that summary judgment is appropriate.

**Factual and Procedural Background**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[2] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[3] The movant bears the initial burden of proof, though "a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[4] Such a movant "may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."[5] The nonmovant must then bring forth "specific facts showing a genuine issue for trial."[6] These facts must be clearly identified through affidavits,

---

[2] Fed. R. Civ. P. 56(a).

[3] *Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 761 (10th Cir. 2017)..

[4] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986))..

[5] *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325)..

[6] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). See D. Kan. Rule 7.4.

deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[7] Conclusory allegations are not sufficient to create a dispute as to an issue of material fact.[8] The court views all evidence and draws "reasonable inferences therefrom in the light most favorable to the non-moving party."[9]

The evidentiary record supports the following findings. The court excludes requested findings which are not supported by reference to admissible evidence or are not material to the issues in the action.   On December 28, 2017, dispatch transmitted alerts at 6:19 p.m. to officers that a shooting had occurred at 1033 W. McCormick in Wichita. Less than a minute later, dispatch radioed officers that the suspect at the residence had shot his dad in the head, that his father was not breathing, and that he was holding his mother and brother hostage at gunpoint in a closet.

Wichita Police Department (WPD) officers and Sedgwick County Sheriff's deputies responded to the scene believing they were responding to a barricaded shooter scenario with hostages where a male had shot his father and was holding family members at gunpoint.

Sedgwick County deputies David Headings and Noah Stephens-Clark responded within a minute or two of the call and were the first officers on scene. WPD

---

[7] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[8] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[9] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (quoting *N. Tex. Prod. Credit Ass'n v. McCurtain Cty. Nat'l Bank*, 222 F.3d 800, 806 (10th Cir. 2000)).

Sergeant Benjamin Jonker was the first supervisor to arrive, so he took charge of the scene and told Officers Rapp and Matthew Powell to follow him to the front of the house.

After Jonker and Rapp had been in position across the street from the front of the house for about 40 seconds, Andrew Finch opened the main door of the house, pushed the screen door open and stepped out onto the porch. When Finch came out, Jonker was still formulating the plan on how to respond to the incident. Officer Rapp, who was assigned long cover with a rifle, fired one shot hitting Finch. The shot was fatal.

At the time of the shooting, Finch was unarmed. In fact, there was no hostage situation or murder scene at the residence. The shooting happened as the resulted of a hoax "swatting" call to 911 by a Los Angeles, California, resident who had no connection to Finch. The hoax caller later pled guilty to federal offenses stemming from the incident and was sentenced to 240 months in prison. It is uncontroverted, however, that the hoax was unknown to the officers at the scene.[10]

The shot occurred less than three minutes after Jonker arrived on scene, and within 40 seconds to a minute after Jonker arrived on the north of the residence.

Officer Dustin Meier is (and was on December 28, 2017) a police officer employed by the City of Wichita. He has been so employed since July 2008, and successfully completed 888 hours of law enforcement training at the Police Academy in

---

[10] *See* Dkt. 31, Uncontr. Fact ¶ 3 n. 2; citing 2020 WL 3403121.

the Fall of 2008. He then received certification as a law enforcement officer by the State of Kansas.

On the day of the incident, Meier heard the radio traffic and responded. According to dispatch records, he arrived and parked near the scene at approximately 6:26 p.m. Meier activated his Axon body camera, and video from this camera captured many of the events set out here.

Meier soon stood behind other law enforcement officers in front of the next-door neighbor's house. As Meier approached from the east, another officer or officers nearer the house were announcing: "Come on out ma'am. Put your hands up and step out."

Plaintiffs Finch and Abdelhadi emerged from the residence. According to Finch, she left the house immediately after Andrew Finch was shot because an officer outside was motioning to her and several officers were yelling to her through the side door. When she and Abdelhadi came out of the house, they were confronted by numerous officers, some holding rifles, others holding handguns, and one holding a plastic shield or "bunker."

The evening was cold. Abdelhadi was wearing a sleeveless shirt and dark jogging pants. Finch was wearing a red long-sleeved shirt, grey sweatpants, and socks but no shoes. Plaintiffs obeyed the commands given to them to put their hands up, turn around, and back up to the officers with their hands raised.

After the shot had been fired and Andrew Finch fell back into the house, Jonker focused on developing a plan to extract Finch from the house. As he was making

arrangements, he saw two people come out of the house but did not know their identity. Jonker had not ordered anyone out of the house. Jonker reported to dispatch that two people were exiting the house and told dispatch that he would need patrol cars to the east to put those people in.

As Jonker was discussing the plan to extract Andrew Finch with another officer, he heard an officer say something about a third person coming out of the house. Jonker still had not ordered anyone out of the house nor ordered any other officer to order anyone out of the house.

Officers then moved an SUV to the front of the house to provide cover for officers to attempt entry. During that time, officers who were with the people who had exited the house informed Jonker that these individuals had reported that a 14 or 16-year-old remained upstairs in the house. At that time Jonker instructed Sgt. Stephen to use the PA on his patrol vehicle to announce to anyone inside to come outside.

Jonker and other officers then moved forward with the plan to extract the male who had been shot. Once entry was made, the officers encountered a younger man coming down the stairs.

Abdelhadi and Finch were escorted by other officers near the front edge of their property toward the front of the neighbor's house. Meier had Abdelhadi place his hands on his head and performed a quick pat-down search with one hand. Abdelhadi put his hands behind his back at Meier's request, and he was handcuffed without any

force in a standing position. Meier walked him to a position on the driveway of a residence two houses away, and asked him who might still be in the house.

Lisa Finch was handcuffed behind her back by another law enforcement officer who is not a defendant in this case. This officer escorted Finch to the place on the driveway where Meier and Abdelhadi were standing and then left. A third individual, Adelina Finch, a young female family member, had been handcuffed by an unknown officer and was also standing in the driveway.

Meier talked to Abdelhadi and Adelina Finch regarding what happened in the house. Lisa Finch was sitting near them on a bench by the driveway. Abdelhadi, Lisa Finch, and Adelina Finch reported that nothing had happened in the house before Andrew Finch was shot by police. Meier asked Abdelhadi who was at the front door and Abdelhadi replied it was Lisa Finch's son Andy, but he didn't have a gun.

Meier explained that there was a report that someone inside the house was shot before police arrived. He explained they were handcuffed because police did not know what was going on in the house.

Meier, Abdelhadi, Lisa Finch, and Adelina Finch continued to talk. Meier said police were worried that there was still someone else in the house who was shooting. He also said that there had been a report that a shooter in the house was holding three hostages.

Responding to a question from Lisa Finch, Meier said that officers were trying to get into the house. Adelina Finch complained that Andrew Finch had been shot.

7

Abdelhadi said: "They were responding to a call. They don't know. They were doing their jobs."

Abdelhadi asked Meier if police had a way to trace the call, referring to the 911 caller. Meier responded, maybe, if there was a phone number.

Adelina Finch moved closer to the street trying see around to the residence. Meier addressed her and she responded that she had a right to see, and was not going to run away. Meier said: "I understand, you're not even in trouble right now but I don't know what happened in the house."

Adelina Finch said she didn't know either. Meier said the police were trying to figure out what happened. He also told her that he wanted her to move back because he did not want her to be in the way of fire if more shots were fired.

Eventually, a team of officers entered the residence. About three minutes later, officers reported on the radio that there was supposed to be a suspect inside in a closet with a handgun. A further three minutes later, officers reported over the radio that police were continuing through the house but the caller was still calling.

After a further three to four minutes, radio traffic indicated the continued confusion as the putative shooter and hostage-taker was still making hoax calls after officers had entered the house. An officer over the radio asked dispatch if they could hear the officers yelling through the caller's line. Officers also radioed for a ladder to check the attic inside the house.

Meier talked to Adelina Finch and Abdelhadi regarding the layout of their house and what had happened before the police arrived.

Chad Beard was a sergeant (now a lieutenant) with the Wichita Police Department. On December 28, 2017, he responded to the incident call and arrived after the shooting had occurred. He saw three individuals seated or standing a couple of houses away from the residence. Beard approached Meier and asked Abdelhadi if anyone else was still in the house. Beard told Meier, "Let's get them out of the cold." He told Abdelhadi, Adelina Finch, and Lisa Finch that police would get patrol cars for them to sit in.

Adelina Finch asked Beard about her phone. Beard responded to the effect that there was a dead man, so a phone was the least of their worries. Beard was not aware at that time that the fatal shot had been fired by an officer.

Adelina Finch, Abdelhadi and Lisa Finch volunteered information that there were no guns in the house, and no shooting had occurred before police arrived. Abdelhadi repeated that Andrew Finch did not have a gun and said: "Whoever called you, you better find him or trace the call." Meier said that they were "working on that."

Abdelhadi asked if the handcuffs could be removed. Meier told Adelina Finch and Abdelhadi that once they are in patrol cars he will make some calls to see if their handcuffs could come off.

A female officer arrived and walked Adelina Finch to a patrol car, while Meier walked Abdelhadi to his car, where he took the handcuffs off and replaced them with a

9

two sets joined together for more comfort. Abdelhadi said: "Thank you. I appreciate that."

As Meier placed Abdelhadi in the back of the vehicle he said, "When we get down there, we'll take these off and all that stuff. Basically, what we're going to do, we gotta take you down, the detectives are going to talk to all of you that were in the house, see what you saw and all that stuff." Abdelhadi acknowledged that he understood.

Abdelhadi got into the back passenger seat at Meier's request. No force was used. By this time, Abdelhadi had been detained for about 37 minutes.

While Abdelhadi was in the patrol car, Meier spoke with another officer in the street for a time. He walked back to his patrol car, opened the door, and had Abdelhadi step out. Meier took off the double set of handcuffs, and had Abdelhadi get back into the car. He asked Abdelhadi for his personal information, and took notes as Abdelhadi responded.

Meier told Abdelhadi, "What we're going to do, I'm going to transport you … I'm going to take you up to our investigation floor and a detective will talk to you about what you heard, saw, and all that stuff." Before driving Abdelhadi to City Hall for a detective interview, Meier asked him if he was "okay with going downtown and talking with detectives" about what Abdelhadi saw and heard. Abdelhadi answered, "yes."

Meier's car was blocking an intersection from pass-through traffic. He told Abdelhadi that they were waiting for another officer to take over Meier's position.

Abdelhadi said, "okay." While waiting in the car, Abdelhadi said: "People don't know what you go through. At any moment you could get shot at."

Meier received a communication to start transporting Abdelhadi to City Hall downtown, and drove to the City Hall parking garage. Meier escorted the unrestrained Abdelhadi to the interview room, but did not participate in the detective's interview of Abdelhadi

The detective apologized for the delay. Abdelhadi responded, "You're doing your job," and raised no objection to the interview.

During the interview, Abdelhadi stated: "But at the same time if the cops are getting a call saying there is a shooting of course they are going to be on their toes and heels and they've got to be careful too so they are doing their job so." After the detective explained that there had been a call stating that there was a shooting and two people being held in the home, Abdelhadi stated: "Yeah, so for the I- I- I- I- I can't blame them they have to assume the worst… And protect us and themselves so."

Meier detained plaintiff Abdelhadi for approximately 42 minutes (some of which was in Meier's patrol car) before he removed the handcuffs and Abdelhadi said it was okay to transport him to City Hall. The Defendants contend that Abdelhadi voluntarily consented to being driven for a detective interview. The Plaintiffs controvert this conclusion (Dkt. 45, at 5), but cite no evidence.

Meier detained plaintiff Lisa Finch for approximately 26 minutes before she was escorted by Officer Codie Trobaugh to a patrol car. Meier told Finch that officers would

11

take her downtown for questioning by detectives while she was still handcuffed in the back seat of the patrol vehicle.

Trobaugh is (and was on December 28, 2017) an officer employed by the City of Wichita and assigned to road patrol. He had been so employed since July 2016. He successfully completed 895 hours of law enforcement training at the Police Academy in the Fall of 2016. He then received certification as a law enforcement officer by the State of Kansas.

On the day of the incident, Trobaugh heard the radio traffic and arrived at 6:48 p.m.  His experiences were also recorded on body camera video, in which he is first seen running down the sidewalk with a ladder. He left the ladder at the house where the incident occurred, and walked over to the neighbor's driveway where Meier, Abdelhadi, Lisa Finch, and Adelina Finch were located. Meier told Trobaugh to bring his patrol car to the driveway for Lisa Finch to get into. Meier said that Lisa Finch couldn't walk very far.

Trobaugh returned with his patrol car and walked up the driveway, where Abdelhadi and Adelina Finch were standing and Lisa Finch was sitting on a bench.. Meier said to Lisa Finch: "Ma'am, you want to come out to this car." Trobaugh escorted Lisa Finch to the patrol car. By this time, Lisa Finch had been detained for about 27 minutes.

Trobaugh had her get into the back passenger seat. He then returned to the driveway and spoke briefly with Meier. He returned to the car and asked Lisa Finch for her personal information.

Trobaugh had Finch get out of the patrol car and he replaced her single pair of handcuffs with a double set. He returned her to the patrol car, where he continued to ask for her personal information. He also had her tell him what happened in the house before and after the police arrived. Trobaugh walked up the street where a group of firemen and officers were standing.

Trobaugh later told Finch that he could not take her back to her house because it was a crime scene. He told her his supervisors had directed him to take her to the "sixth floor" (the detectives' office in City Hall) to be spoken to by detectives. He said she would not be able to get back inside her house until police are done processing the scene. Finch said she would give police permission to search the house so they would not have to wait for a search warrant.

Finch did not verbally or nonverbally object to Trobaugh's indication that she would be transported to City Hall for a detective interview. At the same time, she did not affirmatively indicate by word or gesture to indicate that she agreed to be taken downtown.

When she asked, he assured her that she would get a ride home when she was done at City Hall. He also helped her to put on her seat belt. Trobaugh and Lisa Finch

13

talked casually during the drive to City Hall. In response to Finch's question, Trobaugh indicated that it was then 7:17 p.m.

Arriving at the parking garage, Finch thanked Trobaugh for "putting up with my questions." Trobaugh told her it was all right, that they would be asking her "a lot of questions too here in a little bit." Finch said: "I'm going to ask them a lot." Trobaugh responded that he hoped they could give her the answers she was looking for.

When Trobaugh escorted Finch into City Hall, she was not handcuffed. They took an elevator to the detectives' office on the sixth floor, and Trobaugh walked Finch to the interview room. In the room. Trobaugh had Finch stand up and did a quick "electric wand" search over her clothes. Finch asked Trobaugh if the door to the interview room would locked and he said it would be. Trobaugh left the interview room to refill Finch's cup of water and locked the interview room door while he was away.  After getting the water to Finch, Trobaugh left the area.

Detective Relph interviewed Finch. Trobaugh did not participate. Relph told Finch that Andrew had passed away. Lisa Finch began the interview asking, "Well, do you want to ask the questions or do you want me to?"

When Detective Relph asked if anyone else had interviewed her, she said, "No, I was interviewing them trying to find out information but nobody knew anything." She raised no objection to being interviewed.

Trobaugh detained Finch for approximately 13 minutes before transporting her to City Hall.

14

Based on the video, Defendants contend that Finch voluntarily agreed to the transportation.  The Plaintiffs deny this contention but point to no specific evidence. The transportation to the detectives' interview room took approximately sixteen minutes.

During the interviews with the detectives, Abdelhadi and Finch were not expressly asked if they were giving their statements voluntarily, or if they and agreed voluntarily to come downtown. Abdelhadi's interview ended after 9:30 p.m., Finch's lasted until almost 10:00 p.m.

**Analysis**

Public officers enjoy a qualified immunity to suit under § 1983, which applies "unless their conduct was unreasonable in light of clearly established law." "If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation."[11]

Once Defendants asserted qualified immunity, the burden is on Plaintiffs to prove (1) the officers violated a federal constitutional or statutory right, and (2) that the right was clearly established at the time of the unlawful conduct.[12] A rights is "clearly

---

[11] *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

[12] *Saucier v. Katz*, 533 U.S. 194, 201 (2001), overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)

established" if Supreme Court or Tenth Circuit precedent (or the weight of authority from other circuits) would put reasonable officers in the defendants' position on notice they were violating the constitution.[13] The law must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[14] This does not require the existence of a case exactly on point,[15] but does require that the existing caselaw be sufficiently clear to place the constitutional issue "beyond debate."[16] "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"

The court has the discretion to determine the order in which these requirements are addressed;[17] immunity exists if either element is absent.[18] Only when a plaintiff satisfies this heavy burden must the defendant then satisfy the traditional summary judgment standard.[19] In determining whether the law was clearly established, the dispositive question is "whether the violative nature of *particular* conduct is clearly

---

[13] *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1210 (10th Cir. 2017).

[14] *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (citation omitted).

[15] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

[16] *White v. Pauly*, 137 S.Ct. 548, 551 (2017).

[17] *Pearson*, 555 U.S. at 236.

[18] *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citation omitted).

[19] *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1212 (10th Cir. 2019)

established," which "must be undertaken in light of the specific context of the case, not as a broad general proposition."[20]

In the present case, however, much of the Plaintiff's Response to the motion for summary judgment simply recites broad general propositions relating to arrest and detention,[21] and offers little response to the specific argument advanced by Defendants – that the limited intrusion on Plaintiffs' freedom was justified by the extraordinary events which were still unfolding while that detention occurred. As noted below, the few cases which Plaintiffs have identified as potentially relevant to a community caretaking detention bear almost no relevance to the present case.

Because Plaintiffs have pointed to no Supreme Court case or controlling Tenth Circuit precedent which would have reasonably informed these officers that their conduct was unlawful, summary judgment is warranted. Thus, without deciding whether the Plaintiffs have established a constitutional violation on grounds their detention was unlawful, this Court concludes that even if, on Plaintiffs' version of the facts, a constitutional violation could be shown, it would not be clear to a reasonable officer in the Defendants' position that their conduct was unlawful in the situation the Defendants confronted.

All the Defendants advance claims for summary judgment based on qualified immunity, raising similar arguments. However, Sergeants Jonker and Beard have

---

[20] Mullenix, 136 S.Ct. at 308 (citations and quotation marks omitted) (emphasis in *Mullenix*.)

[21] See Dkt. 45, at 11-17.

separately moved for summary judgment, presenting the additional argument that they played no personal role in the detention.  A plaintiff must show an "affirmative link" between the supervisor and the constitutional violation, which requires a showing of (1) personal involvement in the deprivation, (2) causation, and (3) the state of mind required to show a violation of the right."[22]  In their Response, Plaintiffs agree that there is no evidence Jonker was personally involved in the detention, and that his motion for summary judgment should be granted.[23] They argue, however, that during his brief visit to the neighbor's driveway, Beard was personally involved in the detention by suggesting the Plaintiffs be placed in patrol cars while they waited.  The court need not separately decide the issue of Beard's personal involvement, as it decides that the detention itself violated no clearly established law.

Finch was detained for approximately 26 to 27 minutes by Meier before she was placed in a patrol car. Trobaugh then waited with her for approximately 13 minutes in car, before taking a 16 minute drive to City Hall. Abdelhadi was detained for 37 minutes before being placed in Meier's patrol car. He spent approximately 42 minutes in handcuffs (both before and after being placed in the patrol car). There is no reason to believe that Meier's drive of Abdelhadi to City Hall took much longer than Finch's

---

[22] *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019).

[23] Dkt. 45, at 31.

drive. Both Plaintiffs were thus physically restrained for approximately 40 minutes, and their total detention by the Defendants lasted about an hour.[24]

An officer detaining a citizen is protected by qualified immunity so long as he had at least "arguable" probable cause to believe the restraint was required.[25] With respect to this relatively brief detention, which was undertaken in the immediate wake of one fatal shooting and while officers were trying to deal with a caller reporting another shooting and a hostage situation, Plaintiffs identify only a few cases which they suggest are relevant to the community caretaking function.  They also attempt to distinguish, unsuccessfully, a case cited by Defendants which appears bear some strong resemblances to the present action.

A brief review of the cases cited by Plaintiffs confirms the lack of application to the present case, which involves a detention after a fatal shooting and during an ongoing homicide and hostage situation.  In *Manzanares v. Higdon*,[26] the Tenth Circuit held that a police officer was not entitled to qualified immunity, but the crime under investigation had occurred some time previously. The officer entered the home of the plaintiff Manzanres believing that he knew the location of another person, a potential

---

[24] Plaintiffs complain in their Response that they were unable to leave their interviews at City Hall until nearly 10:00 p.m. But none of the named defendants participated in the interviews. Meier and Trobaugh drove Plaintiffs to City Hall, escorted them to the interview areas, and left them with the detectives.  Accordingly, the court considers only the extent to the detention at the scene and during transport.

[25] *Shimonura v. Carlson*, 811 F.3d 349, 351 (10th Cir. 215).

[26] , 575 F.3d 1135, 1148 (10th Cir. 2009).

suspect. Manzanares was not a suspect, and the officer "had no reason to believe that Manzanares observed the alleged crime,."[27] Based on nothing more than "an unsubstantiated hunch" that Manzanares might warn the suspect, the officer  kept Manzanares, who was "not suspected of a crime, and not a witness to any crime[,] detained in handcuffs in the squad car for more than three hours."[28] Here, Abdelhadi and Finch were potential witnesses to two shootings – the one reported by the caller, as well as the tragic death of Andre Finch on the front porch.

Plaintiffs also cite *Novitsky v. City of Aurora*,[29] in which officers responding to a "man down" report forcibly detained an individual found sleeping in a parked car by using a forcible "twist lock" restraint. The court agreed the officers had good reason under the community caretaking function to approach the plaintiff, and good reason to suspect he might be intoxicated.[30] But, the court stressed, there were additional reasons to believe the use of physical force was unjustified:

> As our previous panel recognized during Mr. Novitsky's criminal case, Officer Wortham testified that Mr. Novitsky did not make any furtive movements in the car. Moreover, Mr. Novitsky did not resist Officer Wortham in any way; in fact, his demeanor was apparently benign, as he

---

[27]  *Id*. at 1147.

[28]  *Id*. at 1140-41. The court further noted Manzanares' allegation that that the Albuquerque police intentionally made the detention worse by "blasting the heat and music" in the squad car. *Id*. at 1141, n. 5.  On the issue of qualified immunity, the court distinguished the case cited by defendant (*Walker v. City of Orem*, 451 F.3d 1139 (10th Cir.2006) (holding that the contours of the right to detain a witness were not clearly established), reiterating that "Manzanares, unlike the plaintiffs in Walker, was not reasonably believed to have witnessed a crime"). Id. at 1150.

[29] 491 F.3d 1244 (10th Cir. 2007)

[30] Id. at 1253-54.

had begun to help himself out of the car when the twist lock was applied. Furthermore, Officer Wortham testified there was no evidence that a crime had occurred or that Mr. Novitsky "had engaged in criminal activity Indeed, the officers did not encounter Mr. Novitsky while investigating a crime; they arrived in the YMCA parking lot to check on the welfare of Mr. Novitsky's companion.[31]

Here, of course, police were actively investigating multiple crimes. Fatal violence had occurred and, for all the officers knew, might still be occurring. *Novitsky* would not instruct a reasonable officer that a detention under the circumstances of this case was unlawful.

Plaintiffs cite *Storey v. Taylor*[32] for the general principle that a detention under the community caretaking function "must be based upon specific and articulable facts."[33] This generality, however, would not make clear to Meier or Trobaugh that their actions violated established law. In *Storey*, responding to an anonymous call of a domestic argument, officers physically pulled the plaintiff out of his house when he refused their order. The court cited the following facts relevant to the supposed exigent circumstances warranting the arrest:

> First, Los Lunas police received a report of a domestic dispute— specifically, a loud argument—at Storey's residence. Second, by the time police arrived, they could not hear or otherwise detect an ongoing altercation; the argument, apparently, had ended. Third, *there were no other visual or audible indications of past or present violence.* Fourth, Storey answered the door and admitted he had an argument with his wife, but

---

[31] *Id*. at 1255 (quotations and citations omitted0.

[32] 696 F.3d 987 (10th Cir. 2012).

[33] Dkt. 45, at 18.

claimed the argument was now over and she had left. Fifth, while the officers were talking with Storey, they observed Storey's wife, Theresa, returning to the house via the garage. Nothing the officers observed about her suggested a risk to her safety.[34]

The cases cited by Plaintiff[35] uniformly involve both a higher degree of personal intrusion (physically manhandling a person or leaving them handcuffed for three hours) than what is presented here, along with far less justification. In none of the cases cited by Plaintiffs was there an ongoing violent crime. Here, the anonymous calls kept coming after the fatal shooting.

Two cases have recently addressed the detention of persons in the vicinity of unfolding violence, both have found the law was not clearly established.  In *Chivers v. Reaves*,[36] cited by the Defendants, officers responding to a disturbance call were greeted by shots from the plaintiff's boyfriend. No officers were injured, but the boyfriend was hit twice and retreated. As the standoff unfolded, the plaintiff emerged from the house

---

[34] *Id*. at 994.

[35] Other cases cited by Plaintiffs are even more distant from the circumstances which confronted the Defendants in the present case. For example, in *Caniglia v. Strom*, 141 S.Ct. 1596 (2021), the Supreme Court held that community caretaker doctrine did not apply where police, concerned the plaintiff was suicidal, secured his agreement to be taken by ambulance to the hospital for a psychiatric evaluation by promising not to enter his house to confiscate firearms. After the plaintiff left, the police did just that. The Supreme Court observed that it had "repeatedly stressed" the unique constitutional importance of the home.  *Id*. at 1599. Further, the Court also noted the First Circuit had not found any exigent circumstances existed to justify the entry. In the present case, of course, the Plaintiffs were detained by Meier and Trobaugh outside the house, while an armed event was occurring.

[36] 2007 WL 4296726 (D. Utah), *aff'd*, 750 Fed.Appx. 769 (10th Cir. 769).

and was found in the yard of the house, where she was forcibly handcuffed and placed alone in a police vehicle for about 24 minutes.

Plaintiffs attempt to distinguish[37] *Chivers* because the plaintiff there was only handcuffed for 24 minutes, while they were restrained for approximately 40 minutes. However, this distinction is unconvincing. First, it only focuses on the time in which Chivers was actually left alone and handcuffed in the police vehicle. The officers removed the handcuffs but kept her locked in the vehicle for nearly two and a half hours. She was later driven to a police station, where she waited another 45 minutes before being taken to an interview room. More importantly, this longer detention, the court wrote,

> is easily justified by the circumstances the officers faced at the time. It strains credulity to insist that any officer was required to turn Plaintiff out into the cold and allow her to wander into the police milieu surrounding an active standoff with an armed, severely intoxicated suspect who had already fired at police. Keeping Plaintiff in a locked cruiser while she remained at the scene was appropriate to maintain the status quo and otherwise protect officer, bystander, and Plaintiff's own safety.[38]

In *Quintana v. City of Denver*,[39] the court reached a similar result in a case where plaintiff alleged she was unlawfully detained in a police vehicle for five hours outside her house, during which the police were engaged in an armed standoff with her son inside the house.  The court dismissed the unlawful detention claim, noting "[a]lthough

---

[37] Dkt. 45, at 16.

[38] 2017 WL 4296726, at *30.

[39] 2021 WL 229270 (D. Col. Jan. 22, 2021).

it is undisputed that Plaintiff was neither under arrest nor suspected of engaging in any crime when she was detained, Plaintiff has not established that the violation of her rights were clearly established in light of the unfolding exigent situation and her status as an witness with pertinent information."[40]

Plaintiffs do note that *Chivers* only addressed the second prong of qualified immunity. The court held that decided the law regarding the detention was not clearly established, and it did hold that there was no constitutional violation.  This is correct, but misses the larger point. The burden is on the Plaintiffs to cite controlling authority clearly establishing the law governing the detention of persons during an armed confrontation.  As noted above, the cases which Plaintiffs do cite have little if anything in common with the present action. *Chivers*[41] and *Quintana* provide substantial grounds for concluding that the law with respect to such detentions is indeed not clearly established.

Here, the essential facts relating to the detention as the scene may be summarized briefly.  Both Abdelhadi and Finch were kept in custody for approximately an hour.  For about 40 minutes they were handcuffed, but during some of this time they were double-handcuffed for (relative) comfort.  The Plaintiffs were ordered out of the house immediately after a fatal shooting on the porch, and while the officers believed

---

[40] *Id.* at *6

[41] The Tenth Circuit affirmed the dismissal without additional discussion, observing that "[w]hen a district court accurately takes the measure of a case and articulates a cogent rationale, we see no useful purpose for a reviewing court to write at length." 750 Fed.Appx. at 770.

another gunman remained inside the house. Because the night was cold and the Plaintiffs were not fully dressed, they were placed in squad cars. Both Abdelhadi and Finch appeared to be calm, and neither resisted to the detention or voiced objections. Abdelhadi in fact expressed concern for "what you [police] go through." While this detention occurred, other officers were still investigating the events at the residence. As noted above, the police were still acting under the belief that a killer remained inside the residence. The court need not decide whether these circumstances would constitute an unlawful detention, as it is clear that Plaintiffs have failed to show the law governing detentions during the course of an armed confrontation was clearly established.

The court reaches the same result with respect to the transportation of Abdelhadi and Finch to City Hall. The Plaintiffs contend they did not voluntarily consent to this transportation—stressing that Finch was never explicitly asked if she wanted to be driven to City Hall, and that Abdelhadi (who was asked) gave but a "single expression of consent."[42] However, they point to no Supreme Court case or controlling Tenth Circuit precedent clearly establishing the law regarding transportation to a police station in the wake of a shooting.

Here, as just noted, both Abdelhadi and Finch appeared calm, and Abdelhadi expressly agreed to the trip. After the trip and the detective apologized for the delay, Abdelhadi responded the detective was doing his job. Finch did not object to the

---

[42] Dkt. 45, at 29.

transportation, and her only voiced concern was whether she would be given a ride home after the interview.  Finch volunteered to sign a waiver for a search warrant for the house.  She also asked questions during the drive and, when they got to the City Hall parking garage, told Trobaugh she was looking forward to the interview because she had her own questions for the police.  For both Abdelhadi and Finch, the drive took approximately a quarter of an hour, and only marginally expanded the length of their detention. Finally, the Plaintiffs have not pointed to any real alternative to the transportation. It is uncontroverted that, at the time in question, the residence was a crime scene, and the Plaintiffs could not return there. The night was cold and the Plaintiffs were not fully clothed.

As with the detention at the scene, it is unnecessary to determine if Meier and Trobaugh's transportation of Plaintiffs to City Hall under these circumstances was a constitutional violation. Again, Plaintiffs have failed to show Supreme Court or Tenth Circuit precedent showing that the transportation violated clearly established law. Plaintiffs cite to general standards of consent,[43] but cite no controlling authority clearly establishing conduct which cannot be deemed to be at least implied consent to transportation. Because the police had at least arguable grounds for believing Plaintiffs

---

[43] *See United States v. Butler*, 966 F.2d 559, 562 (10th Cir.1992) (for consent to be effective, "(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied").

did not not object to the transportation, summary judgment is also appropriate as to this element of their claims as well.

Here, qualified immunity is warranted because there is no case in the Tenth Circuit clearly establishing that the approximately hour-long detention of Plaintiffs in the wake of a fatal shooting and apparently ongoing hostage standoff was not "within the bounds of appropriate police responses" given the circumstances of this case.

IT IS ACCORDINGLY ORDERED this 3rd day of November, 2021, that the Defendants' Motions for Summary Judgment (Dkt. 35, 36) are granted as provided herein.

IT IS SO ORDERED.

This case is closed.

*Eric F Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE